## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

**DAVID HATCHIGIAN AND**
**JOAN RANDAZZO,**

      **Plaintiff,**

**vs.**                           **Civil Action No. _____**

**CARRIER CORPORATION AND**     **Jury Trial Demanded**

**PEIRCE-PHELPS,**

      **Defendants.**

## COMPLAINT

Plaintiffs DAVID HATCHIGIAN and JOAN RANDAZZO, hereby file their verified complaint against the Defendants, CARRIER CORPORATION and PEIRCE PHELPS (hereinafter "Defendants"), alleging COUNT I (BREACH OF EXPRESS WARRANTY - UCC §§ 2-313); COUNT II (BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE - UCC §§ 2-314, 2-315); COUNT III (VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT); COUNT IV (BREACH OF CONTRACT); COUNT V (UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW); COUNT VI NEGLIGENT DESIGN; COUNT VII NEGLIGENT INSTALLATION and  seeking damages, attorney's fees and exemplary damages, against the Defendants.

1

## I.     INTRODUCTION

1.  Like thousands of homeowners across the country, Plaintiffs purchased an air conditioner manufactured by heating, ventilation, and air conditioning ("HVAC") manufacturer Carrier to cool his home during the summer months.

2.  Carrier advertises its product as specifically designed for residential use, and prices the product accordingly.

3.  But after installation, the unit degrades, decomposes, rots, cracks, splits, checks, splinters, peels, delaminates, flakes, soaks, expands, swells, and develops wet mold causing mold and/or mildew, black spots, streaking and discoloration in the surrounding wall and contaminating the air breathed by occupants.

4.  Upon information and belief, manufacturer Carrier was aware of this mold-inducing defect when it sold its product to Plaintiffs, but failed to disclose that units placed on the market still had this known defect.

5.  Carrier's HVAC unit comes with no mold warning when installed.

6.  There was no other cause of the roof leak or mold contamination other than the roof top unit improperly installed by Peirce-Phelps and negligently designed/manufactured by Carrier.

7.  When homeowner Hatchigian complained about the mold and damage to his home, he sought to be made whole on his bargain.

2

8.  Defendant Carrier extends a written warranty directly to consumers long after the sale and warrants that for a period of five (5) years its product shall be free from material defects in workmanship and materials. (see "Extended Protection Warranty", Ex. 16)

9.  Defendant Peirce-Phelps extends a written warranty directly to consumers after the sale and warrants that for a period of (15) years its product shall be free from material defects in workmanship and materials. (Ex. 16, Warranty)

10. But Carrier only offered to replace the defective unit with another defective Carrier unit.

11. Carrier refused to pay any of Plaintiffs' remediation costs or the charges for labor in connection with uninstallation and removal of the unit and the damaged wall and roof, product replacement costs or medical expenses to diagnose mold-related health issues, which were not necessary but for Carrier's negligence.

12. In denying reimbursement of these costs, Carrier relied on a written warranty provided after the sale which purports to exclude such charges and other costs.

13. At all relevant times, Carrier was on notice that these costs in fact far exceed the price of the purchased unit, such that Carrier's proffered remedy is really no remedy at all.

14. This was not the first time that Carrier attempted to evade liability with respect to the subject model: In a prior litigation complaining of its defective HVAC product, the company was accused of recalcitrance in providing for adequate warranty remedies. (See Settlement Release and Agreement, D.H. vs. Carrier & Pierce-Phelps #150604314).

15. That case settled with a provision that Carrier would pay for replacement labor costs.  But the company learned no lasting lessons. Instead, it employed the same hard-nosed and unlawful tactics that led to the instant suit.

16. Carrier failed to honor the parties' judicially approved settlement and offered an unconscionably broad release waiving all of the customer's future rights to buy any Carrier product, which it knew the customer could not be legally required to waive and was unwilling to waive.

17. Carrier's conduct of the settlement in the prior lawsuit was blatant in light of the recurring product failures in the air conditioner model at issue, which Carrier placed on the market knowing full well that customers were likely to be injured and/or suffer mold and mold-related medical conditions and property damage.

18. It is believed and therefore alleged that Carrier may have placed millions in reserve to deal with future losses stemming from consumer claims and replacement procedures.

19.But regardless of the reservation of such funds, Defendants may not lawfully rely on warranty terms purporting to exclude any and all liability for damages such as out of pocket fees for uninstallation and replacement labor, health provider fees for diagnostic laboratory testing, medical bills, and other mold-associated and mold-induced costs not a consequence of product use or "incidental" to Plaintiff's original purchase as a matter of state warranty law, particularly where such expenses were not timely disclosed to the purchaser as such.

20.Homeowners Randazzo and Hatchigian state claims for both negligent construction and subsequent negligent repairs. In handling the sales transaction and Plaintiff's warranty claim, Defendants additionally violated the federal Magnuson-Moss Warranty Act and state consumer protection law. This action is to vindicate Plaintiff's rights as a homeowner and shed judicial light on the rights of future plaintiffs who litigate and/or settle similar claims nationwide against Carrier.

## II.    **JURISDICTION AND VENUE**

21.The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 1343(a)(1). It has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

22.The amount-in-controversy and diverse-citizenship requirements are satisfied in this case.

23.Given that Carrier sells its products nationwide and has been sued in several jurisdictions over issues with defective Carrier products, given that Carrier Insurance Carrier  has set aside funds in anticipation consumer claims arising from its sales of defective products, knowing conduct by Carrier in breach of its product warranty and the damage-multipliers available under Pennsylvania consumer protection laws, Plaintiffs believe, and therefore allege, that the aggregate amount in controversy exceeds $75,000.00.

24.As to diverse citizenship, Plaintiff is a citizen of Pennsylvania, while Carrier has its principal place of business in P.O. Box 4808 Carrier Parkway, Syracuse, N. Y. 13221  such that Carrier's regularly conducts business (and otherwise anticipates being subject to personal jurisdiction) in this judicial district. Accordingly, venue is appropriate in this Court per the terms of 28 U.S.C. § 1391(b) and (c).

## III.    **THE PARTIES**

25.Plaintiffs David Hatchigian and Joan Randazzo are married residents of Havertown, Upper Darby Township, Delaware County, Pennsylvania, United States.

26.Defendant PEIRCE-PHELPS (hereinafter, "Peirce-Phelps) is a Delaware corporation engaged in the sale and distribution of air conditioning and heating systems.  (Plaintiff reserves his right to update the caption with the correct entity information.)

27.Defendant CARRIER CORPORATION (hereinafter, "Carrier") is a Delaware corporation engaged in the designing, engineering, and installation of air-conditioning and temperature-control systems and is one of the fifty largest HVAC distributors in the country.  Its parent corporation, UTC Building & Industrial Systems, a unit of United Technologies Corp., is the world's largest high-technology building systems provider and a leading supplier to the aerospace and building systems industries worldwide. Principal Subsidiaries include: Carrier Air Conditioning Pty. Limited (Australia); Carrier Aircon Limited (India); Carrier China Limited (Hong Kong); Carrier Commercial Refrigeration, Inc.; Carrier Espana, SL (Spain); Carrier HVACR Investments B.V. (Netherlands); Carrier LG Limited (South Korea); Carrier Ltd. (South Korea); Carrier Mexico S.A. de C.V.; Carrier Nederland BV (Netherlands); Carrier Sales and Distribution, LLC; Carrier SAS (France); Carrier SpA (Italy); Carrier Singapore (PTE) Limited; Carrier Transicold Europe S.A.S. (France); International Comfort Products, LLC; Misr Refrigeration and Air Conditioning Manufacturing Company S.A.E. (Egypt).

[Plaintiff reserves his right to update the caption with the correct entity information.]

## IV.   GENERAL ALLEGATIONS

28. Defendant Carrier is the designer, manufacturer and marketer of the roof top condensing unit purchased by Plaintiffs in 2005.

29. Specifically, in 2005, Plaintiffs were Pennsylvania residents and private homeowners and purchased a Carrier rooftop condensing air conditioning unit, Model 50GL, Serial # 3805041639 (hereinafter "roof top unit"; "Carrier unit"; "HVAC unit";) from HVAC distributor Peirce-Phelps, a retail/wholesale seller of Carrier condensing units that regularly sold Carrier items at retail from its retail store and warehouse locations and installed Carrier air conditioning systems in both residential and commercial properties.

30. When the Carrier product alleged in the Complaint was purchased and installed by Peirce-Phelps in the roof of the building located @ 7512 Brentwood Road, Philadelphia, PA 19151 ("the Brentwood Property"), David Hatchigian was the sole owner-lessor of the building.

31. The married Plaintiffs resided on the ground floor of the Brentwood Property. The upper floor apartment at the Brentwood Property was periodically leased out to tenants.

32. The Carrier unit referenced by the Complaint was purchased and installed by seller Peirce-Phelps solely for Plaintiffs' personal and household use.

33. When the unit malfunctioned, there were no existing defects in the roof paneling around the unit or in the flooring or the surrounding wall where the mold appeared.

34. Prior to 2013, there had been no mold anywhere at the Brentwood property.

35. Plaintiffs complied with all use and maintenance recommendations in the warranties and reasonably believed that Defendants would perform its obligations pursuant to same.

36. Plaintiffs at all times used the unit for the principal function it was advertised to perform, regularly cleaned the air conditioning filters and maintained the unit in accordance with the manufacturer's specifications. As recommended by Carrier's Guide to Operating and Maintaining your Single-Packaged Electric Cooling Unit, Plaintiffs regularly replaced the filters and drive belt in the roof top unit (at least twice annually) from 2005-2013. They maintained and cleaned the unit, including the interior coils and blower wheels.

37. Periodic operational checks were performed by Plaintiffs, including for thermostat cooling set points.

38. The checks were performed twice annually, in 2008, 2011, and again in 2013.

39. The defect of the air conditioning unit was not apparent at sale or upon either of the first two post-installation inspections by Plaintiff.

40. But in the course of the check in 2013, Plaintiff Hatchigian discovered mold growth as well as water damage near and around the roof of the Brentwood Property.

41. At the time of the sale and upon installation, the Carrier roof top model was warranted to homeowner Hatchigian to be in good working condition.

42. Prior to purchase and again at the time of installation seller Peirce Phelps provided Plaintiffs with the express verbal warranty that the unit was "waterproof" and designed for roof top installation.

43. Without the represented "waterproof" quality of the air conditioner, Plaintiff homeowners would never have purchased the subject unit.

44. Based on these verbal warranties at sale and at the time of installation, Plaintiff homeowners reasonably expected the unit to function as an air conditioner, the sole purpose for which it was purchased.

45. Carrier did not provide them with a written warranty prior to or at the time of the sale, but Plaintiffs were thus led to believe the unit was non-hazardous and suitable for residential use.

46. Unbeknownst to Plaintiffs at the time of purchase, the formerly mold-free Brentwood Property would be rendered unfit for habitation once the malfunctioning Carrier unit was installed.  (See Ex. 55-90.)

47. During the summer months and periods of high humidity, the HVAC unit drew humid air into the tenant's upstairs apartment causing the rapid spread of mold.

48. The HVAC unit had drainage components intended to remove liquid condensate and prevent condensate build-up. (See Ex. 28-53)  But the unit allowed widespread moisture seepage below the unit in quantities sufficient to cause mold growth.

49. Eventually, due to the mold caused by the "waterproof" unit, Plaintiffs' continued occupancy became impossible.

50. Mold is a common cause of respiratory symptoms in patients, and the introduction of mold spores and particles into the nose and lungs can be toxic and harmful to lung tissue and the nasal mucosa.

51. The excessive moisture and resulting mold forming at the Brentwood Property caused Plaintiffs to experience respiratory symptoms and other health issues.

52. Some of Plaintiffs' health issues may have been caused by mold infestation in the ductwork, including recurring sinus and bronchial infections and

headaches triggered by the effect of insufficient air return on hyper-reactive airways triggered by the exposure to mold spores.

53. Also, Plaintiffs had rented out the upper story apartment at the Brentwood Property to paying tenants in 2014.   In June of 2015, the tenants abandoned their lease with Plaintiffs and vacated their apartment due to water damage and mold-induced health concerns leaving Plaintiffs with lost rents and no ability to re-lease the upstairs.

54. Hatchigian contacted seller Peirce Phelps about their loss of the use of their house and the separate issue of lost rents due to the mold contamination.

55. Peirce Phelps sent its employee Joseph Vagnozzi to personally inspect the unit onsite at the Brentwood Property.

56. Mr. Vagnozzi was a factory-trained with sixteen (16) years of HVAC-related experience.

57. He was not the individual who sold the unit to Hatchigian in 2005.

58. The first time he was given access to the Brentwood Property, Vagnozzi examined the entire system.  He checked if the unit was properly installed at a level pitch, recorded a leak in the condensing unit, re-sealed the sheet metal screws in the unit's housing and verbally warranted that the unit should not cause further leaks from the roof. See email exchange of February 20-24th ("It looks like we

sealed around the screws in the return section during our last visit with silicone. See attached picture for location of leak we identified.")

59. On his first visit, Vagnozzi did not flood the roof surrounding the unit, spray the exposed surfaces or make any adjustments to minimize condensate accumulation. See Ex.'s 25, 26. After sealing around the screws, he let the unit dry completely, sprayed the elements on the sides, top, and bottom of the unit and checked for water droplets that were pulled into the unit.

60. A few weeks later, the roof top unit started leaking again, and there was water damage to previously unaffected areas of the living space below.

61. By the start of summer and warmer temperatures after Vagnozzi's first visit, it was clear the building was not being cooled to any degree, let alone the temperature range stated in the manufacturer's specifications.

62. Plaintiffs were not in a financial position to wait for Carrier to fully rectify the damage caused by the malfunction.

63. While Carrier continued to delaying its response to their warranty claim, an independent contractor was hired to remove the entire malfunctioning HVAC system from the roof of the Brentwood Property via an industrial crane.

64. The removal charge alone amounted to $15,000.00.

65. Plaintiffs then engaged a professional mold remediation service to make their home habitable. The mold remediation service included remediation of the

mold that developed in the upstairs tenant's apartment due to the defect in the Carrier unit.

66.Plaintiffs then wrote to Carrier about their efforts to fix the damage caused by its roof top unit, including the extensive water damage and mold at the Brentwood Property, attaching a copy of their bill for mold remediation and requested a refund of Plaintiffs' replacement costs.

67.Carrier provided a written version of their warranty.  This document reflected that the roof top unit came with five (5), ten (10) and fifteen (15)-year warranties from the original installation date. (see "Extended Protection Warranty"; see Carrier Customer Relations Request responsive email to Hatchigian and attachment dated March 11, 2015, 3:17 p.m Ex.'s #15-16,).

68.Carrier had marketed its air conditioner as a model specifically designed for roof top installation, but refused the opportunity to reimburse and even denied the unit was waterproof, notwithstanding the results of Peirce Phelps' inspection and confirmation of the defect during the September 26, 2013 inspection (see  Ex. 25) and the mold-free condition of the Brentwood property prior to installation of the Carrier unit.

69.Carrier's ineffective and dysfunctional warranty procedure did nothing to address Plaintiffs' damages or the defect in the roof top unit. See Ex. 5.

70. Plaintiffs' trial evidence will show the absence of any misuse and that 100% of the mold at their Brentwood Property was directly traceable to the defectively designed HVAC system and the Carrier unit's inability to process condensate or with defective installation, See Ex. 1-95; see Elite Water Damage Restoration, Inc. report, Ex.58-90.

71. Seller Peirce Phelps' employee Vagnozzi's second inspection of the Brentwood Property was conducted on February 27, 2015.  See E/M Ex. 11

72. As in his initial inspection, Vagnozzi again resealed the sheet metal screws in the unit's housing and verbally warranted it should not cause further leaks from the roof, but the weather was too cold to spray the unit to check for moisture levels.

73. The third time Vagnozzi visited the Brentwood Property was in July of 2015. [1]

74. The optional filter rack Filter Rack Accessory, Parts # 99080302 or 99080262 shipped by Peirce Phelps had dimensions that did not fit the subject unit.

75. To date, distributor Peirce Phelps and Elite Water Damage Restoration, Inc. ("EWDR") each independently verified that water is entering Plaintiffs

---

[1] His original diagnosis of September 2013 that the unit had a leak led to a pre-trial settlement of the prior litigation.  (See Settlement Release and Agreement, D.H. vs. Carrier & Pierce-Phelps #150604314).

building via the rooftop unit (See Ex. 55-90), but no reimbursement, full or partial, has ever been forthcoming from Carrier or Peirce Phelps.

76. By 2015,   See attached Exhibits ##58, 91-95.  The HVAC specialists at EWDR confirmed that until the unit is replaced in building it will continue to generate mold, making the building unfit for human habitation.

77. Although the HVAC unit was originally purchased for their own family and household use, Plaintiffs lost an additional $15,000, a sum that came due for various mold remediation charges including materials and labor and lost an additional $10,000 in profit and rents. See Ex. 5.

78. Defendants made warranties beyond the terms of the retail sales contract with Plaintiffs to make repeated unsuccessful efforts to repair a Carrier model that completely failed in its intended use.

79. As a result, Plaintiffs sustained the damage to the home's exterior, mold growth, lost rents and/or medical bills for health testing.

80. Plaintiffs were forced to spend an additional approximately $15,000 to renovate the interior of the Brentwood Property to mitigate the effect of the mold created by the Carrier unit, including:

-   $1,700 for residential mold remediation services;

-   $2,700 in lost rents during removal, repair and replacement;

-   $1,000 in investigative costs for Plaintiffs' HVAC expert.

81. Plaintiffs have been extremely damaged by the breach of warranty regarding the defective goods and Defendants' failure to disclose the effect of their disclaimers and refusal to provide adequate redress in response to their warranty claim.

82. As a result of the material defects in the HVAC unit, married Plaintiffs lost the use of their home.

83. As a result of the material defects in the HVAC unit, remain at risk of frequent respiratory infections initially caused by mold bacteria.

84. As a result of the material defects in the HVAC unit, Plaintiffs have incurred lost rents and a diminution of the value of their property.

85. In total, their estimated out-of-pocket cost in contracting fees and labor, materials, and other unanticipated costs expended to rectify the damage and unanticipated losses incurred due to the moldy Carrier unit was approximately $25,000.  See Insurance claim denial letter Ex. 61.

86. Defendants' failure to provide a remedy by reimbursing any portion of the ongoing replacement and remediation costs furnished by the Plaintiffs leaves a current balance of approximately $30, 000.00, with no offsets or credits applied. See Insurance claim denial letter Ex. 61.

87. After the roof top unit malfunctioned, defendants went beyond the scope of the original retail sales contract to make repeated unsuccessful efforts to repair

the Carrier model sold to Hatchigian, which completely failed in its intended use and shown itself to be defective and dangerous.

88. Plaintiffs suffered damages as a result of Defendant's breaches of express and implied warranties as set forth herein. 15 U.S.C. § 2310(d)(1)-(2).

89. Because of Defendants' warranties, they were required to remedy any defects, malfunctions or non-conforming defects in the roof top unit within a reasonable time and without charge to Plaintiffs.

90. Despite timely demand and that Plaintiffs complied with all reasonable terms and conditions imposed by Defendants, Defendants have acknowledged that they are unable to remedy, within a reasonable time and without charge, the defects set forth in this Complaint.

91. Defendants' warranties failed their essential purpose as they did not lead to repair or replacement and failed to provide Plaintiffs with meaningful recourse when Carrier's product failed to cool their property, destroyed their home, and made them sick.

92. Defendants' breach of the warranties violated the Federal Magnuson-Moss Warranty Act.

93. Defendant Carrier engaged in unfair or deceptive acts or practices in violation of Unfair Trade Practices and Consumer Protection Law (UTPCPL) in selling and advertising the air conditioning system for exterior use, and failing to

give Plaintiffs any notice regarding the latent defect when used in exterior

applications despite knowing of the defect.

## COUNT I
## BREACH OF EXPRESS WARRANTY - UCC §§ 2-313

94. The allegations of the above paragraphs are incorporated herein as if re-

alleged in full.

95. Peirce Phelps is a certified Carrier dealer licensed to sell the unit as a

distributor of Carrier HVAC products.

96. Carrier manufactured the defective and nonconforming roof top unit

under the Carrier brand name.

97. Defendants sold the roof top unit under a five (5)- year Extended

Protection Warranty. (See Extended Protection Limited Warranty, Ex. 16) The

"Extended Protection Warranty" promised that the product would be defect free

and that Defendants would pay to repair or replace any product that was defective.

98. The written product warranty expressly promises, among other things,

that Defendants will repair any defects in materials or workmanship, for five (5)

years from the date of original installation:

> FIVE-YEAR LIMITED WARRANTY - Carrier (hereinafter referred to
> as "Company") warrants this product to be free from defects in material
> and workmanship. If a defect is found within five years from date of
> original installation of product (whether or not actual use begins on that
> date) Company will provide a new or remanufactured part, at

Company's sole option, to replace any defective part, without charge for the part itself.

99. The Defendants breached the terms of their warranties relating to Model 50GL, Serial # 3805041639 and Article 2 of the Uniform Commercial Code and Pennsylvania warranty law.

100.   Pennsylvania's Uniform Commercial Code (U.C.C.) applies as indicated to Plaintiffs' breach of warranty claims of this complaint, and the alleged warranty breaches caused actual damages, in an amount to be determined at trial.

101.   At the time of Defendants' breach, all conditions precedent to Defendant's liability under Defendants warranties had been performed by Plaintiffs or had otherwise been waived.

102.   The defects in the Carrier unit and the roof top leak rendered the Carrier unit unsuitable and unsafe for normal residential use.

103.   As confirmed by Peirce-Phelps/Vagnozzi in 2013, the design of the subject roof top air conditioning unit does not allow moisture to evaporate properly from the system.

104.   As manufactured by Carrier and installed by Peirce Phelps, the malfunctioning roof top unit did not adequately remove the humidity from the air at the Brentwood Property.

105.   The evaporator in the unit is defective and/or other mechanical defects in the unit prevent moisture from evaporating, resulting in condensate returning

into the unit and triggering humidity levels sufficient to cause the formation of

mold.

106 Instead of evaporating normally, this defect causes the motor to blow

condensation back into the unit.

107 When the moisture does not evaporate, the residual moisture collects and

was sufficient to cause the growth of mold spores on large surfaces at

the Brentwood Property.

108 The construction of the roof top unit without a working evaporating

system constituted a negligent design of the unit.

109 Defective installation and repair by Defendant Peirce-Phelps' may have

been the primary cause of the product malfunction.

110 Prior to unit installation, no mold was present anywhere in Plaintiffs'

residence.

111 But once the defective unit was installed, it introduced mold.

112 As a result, unless further repairs are conducted at the Brentwood

Property, the ductwork of the house will continue to be affected by mold

contamination in the future, placing Plaintiffs at further risk.

113 Plaintiffs sustained financial losses including, but not limited to, repair

and replacement costs, charges for interior and exterior mold

remediation services, lost rents, diminution of the value of the Brentwood Property, and related costs.

114 Plaintiffs are entitled to recover the benefit of their bargain and/or to recover the full range of remedies under Article 2 as adopted by Pennsylvania as well as all other remedies available at law and in equity, including restitution damages, replacement of the defective product with non-defective, functioning goods of at least the same grade and quality marketed and promised by Defendants, the cost of labor and supplies needed for uninstallation and disposal of the defective goods at Defendants' sole expense, plus the cost of labor and supplies necessary to install the non-defective replacement goods.

THEREFORE, Plaintiffs request damages in an amount including costs, interest and attorney fees and any equitable relief which the Court deems appropriate.

## COUNT II
## BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE - UCC §§ 2-314, 2-315

115 The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

116 Section 2-314 provides that "[u]nless excluded or modified ..., a

warranty that the goods shall be merchantable is implied in a contract for

their sale .... To be merchantable, the goods, inter alia, must be "fit for

the ordinary purposes for which such goods are used."

117 Instead of cooling the temperature at the Brentwood Property, the

improperly installed and defectively designed or defectively

manufactured Carrier unit unreasonably rendered the Brentwood

Property unsafe and uninhabitable.

118 Toxic mold was caused to form along the roof paneling and has spread

at a rapid rate in previously uncontaminated residential living spaces.

See Ex.58-90.

119 The previously intact roof has been placed at risk of collapse due to the

continuous unit leakage.

120 There was an implied warranty that the air cooling equipment

comprising the Carrier's 50GL model, Serial # 3805041639, as installed,

would perform the basic functions Defendants purported it to provide.

121 This implied warranty was breached once the product failed to function

as an air conditioner to any extent.

122 Defendants knew, or reasonably should have known that its roof top unit

would be principally utilized for air conditioning.

123 Defendants knew, or reasonably should have known, Hatchigian would not be the first or only user-purchaser to use the roof top unit as an air conditioner under conditions of rainfall, one of the purposes for which it was sold to consumers.

124 Defendants warranted the unit's fitness for the purpose for which it was sold and reasonable workmanship in its installation.

125 Defendants impliedly warranted that the roof top unit was fit for the purpose for which it was sold to Plaintiff and was not negligently marketed, negligently constructed or negligently designed.

126 Defendants impliedly warranted their roof top unit would not be defective so as to leak to the extent surrounding roofing material would be caused to collapse, rot and contaminate living spaces of the property.

127 The warranty of fitness of the product for use as an air conditioner was implied in law and existed independent of any representations by the Defendants or Defendants' agents.

128 Defendants impliedly warranted that the roof top unit would be installed in a reasonable workmanlike manner.

129 Defendants impliedly warranted installation would not cause property damage or cause physical injuries to Plaintiffs and their tenants.

130 Such warranties arose by operation of law, independent of any contractual representations.

131 Any implied warranties extended to Plaintiff and Plaintiff's tenants.

## COUNT III
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

132 The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

133 Plaintiffs are consumers as defined by the Act.

134 Defendant Carrier is a global supplier and warrantors of HVAC equipment and accessories.

135 The Carrier roof top air conditioner is a consumer product that was purchased from Peirce Phelps for personal/household use.

136 Defendant Carrier extends a written warranty directly to consumers long after the sale and warrants that for a period of five (5) years its product shall be free from material defects in workmanship and materials. (see "Extended Protection Warranty", Ex. 16)

137 Defendant Peirce-Phelps extends a written warranty directly to consumers after the sale and warrants that for a period of (15) years its product shall be free from material defects in workmanship and materials. (Ex. 16, Warranty)

138 The MMWA provides a cause of action for breach of warranty or other violations of the Act. 15 U.S.C. § 2310(d)(l).

139 Defendants have breached its express warranties as alleged herein.

140 By failing to provide merchantable goods, they have also breached the implied warranty of merchantability, which Defendants cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1),

141 Defendants were provided notice of the breach of warranty claims that were raised by Plaintiffs from the sale of the roof top unit, and afforded a reasonable opportunity to cure, but Defendants never cured their breach.

142 Due to failures and omissions on Defendants' part, Plaintiff homeowners did not receive or otherwise have the opportunity to review at (or before) the time of sale the written warranty document containing the purported exclusions and limitations of remedies on which Defendants purport to rely.

143 Accordingly, such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to the full panoply of remedies available under MMWA and Article 2 ofthe Uniform Commercial Code as adopted by the states and the District of Columbia.

144 In addition, Defendants' written warranty contains terms purportedly limiting their liability relative to defective products to mold are nonexistent or inconspicuous, and that lack of conspicuousness violates the MMWA 15 U.S.C. § 2302(a).

145 Defendants' acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful. 15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(l).

146 Plaintiffs have suffered, and are entitled to recover, damages as a result of Defendant's breaches of warranty and violations of the MMWA.

147 Additionally or in the alternative, the MMWA provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by the MMWA. 15 U.S.C. § 2310(d)(l).

148 Plaintiffs seek declarative/injunctive relief relating to the existence of the defects alleged herein, and the remediation of those defects and their coverage under available express and implied warranties.

149 In addition, Plaintiffs also seek and an award of costs and expenses, including attorneys' fees, under the MMWA to prevailing consumers in connection with the commencement and prosecution of this action. 15

U.S.C. § 2310( d)(2). Plaintiffs intend to seek such an award, including

expert witness costs and other recoverable costs, as prevailing

consumers at the conclusion of this lawsuit.

THEREFORE, Plaintiffs request damages in an amount including costs,

interest and attorney fees and any equitable relief which the Court deems

appropriate.

**COUNT IV**
**BREACH OF CONTRACT**
(Against Defendant Peirce-Phelps)

150 The allegations of the above paragraphs are incorporated herein as if re-

alleged in full.

151 In exchange for Hatchigian's payment of the purchase price, seller

Peirce Phelps promised delivery and installation of a working roof top

unit.  Peirce Phelps contracted with homeowner Hatchigian to sell the

subject rooftop condensing air conditioning unit, Carrier Model 50GL,

Serial # 3805041639 and warranted related services including (but not

limited to) "installing, inspecting, servicing, maintaining and cleaning of

the unit at the Subject Premises."

152 Subsequent to the execution of the sales contract, Peirce Phelps

warranted certain post-sale remedies and repair services to cure the

material defects in product installation that may have caused large

quantities of mold and mildew to be introduced into the Brentwood Property and causing the building's roof to develop a leak.

153 But the services actually provided pursuant to Peirce Phelps' post-installation warranties were ineffective and failed to cure the installation issues, the manufacturing/design defect in the Carrier product creating the roof leak and the mold damage to Plaintiffs' property.

154 A true copy of the essential terms that were breached by Defendant is attached to this Complaint as Ex.16.

155 Homeowner Hatchigian was never placed in the position he would have occupied had the contract been fulfilled according to its terms.

156 The contract provisions pertaining to the exclusions of implied warranties and the waiver of statutory warranties are unconscionable and otherwise unenforceable.

157 As a result of Peirce Phelps' contractual breach, Plaintiff homeowners have incurred property damages and economic losses.

158 In addition to Plaintiffs' damages due to Defendant's breach of the promise to install a functioning unit, Defendant's subsequent failure to honor its promise to repair or replace according to its own disclosed specifications exposed Plaintiffs and the tenants living in adjoining areas to serious injury, prolonged unsafe conditions and health problems

including but not limited asthma and an increased susceptibility to a
range of lung disorders and various infections of the lung.

THEREFORE, Plaintiffs request damages in an amount including costs,
interest and attorney fees and any equitable relief which the Court deems
appropriate.

## COUNT V
## UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

159 The allegations of the above paragraphs are incorporated herein as if re-
alleged in full.

160 The subject sale was a consumer transaction for personal use and
therefore, subject to protection under the UCTPCA. Plaintiff purchasers
fully complied with their obligations under the warranties and utilized
the roof top unit for its ordinary purposes.

161 As Defendants knew, standard roof top units are intended to be
waterproof and properly installed so as to withstand precipitation and
condensation.  When the unit fails, the homeowner is at a high risk of
property damage, including mold, mildew and water damage.

162 When the subject roof top unit failed without warning at some time
between 2013 and 2015, Plaintiffs noticed that the unit was creating a

leak in the roof of their residence, and immediately contacted Carrier and seller Peirce-Phelps.

163 After Carrier and Peirce-Phelps learned of the defect in the subject unit and Plaintiffs' damages, the companies generically, specifically and impliedly purported to exclude any liability for consequential and incidental damages.

164 Based on the condition of the roof of Plaintiffs' Brentwood residence as determined upon the seller's re-inspection, Defendants were on notice that the design/manufacturing defect in the unit had not been cured, but nevertheless unreasonably delayed providing remedies under warranty until after Plaintiffs had already expended personal funds to attempt remediation of the mold and water damage.

165 Instead of providing a refund or a working replacement, Defendants refused reimbursement and supplied no working replacement.

166 Defendants knew or should have been aware the roof top unit had a substantial manufacturing and/or design defect when sold to Plaintiffs.

167 As the defects were latent and not discoverable by reasonable inspection at the time of purchase and no disclosures regarding the substantial defect were made to Plaintiffs, Plaintiffs could not have discovered the defect prior to the malfunction, let alone prior to the sale.

168 At no time before or after the sale, or during the applicable warranty periods were Plaintiffs notified that the roof top unit was prone to cause roof damage, mold damage and other property damage.

169 Carrier's denial, limitations on liability and exclusions are unconscionable and not legally binding to the extent Plaintiffs reasonably understood that the unit would not damage their home to the degree that occurred.

170 Plaintiffs were unaware of any limits on warranty coverage with respect to mold damage due to product leakage.

171 Even if Plaintiffs had read the disclaimer, they did not assume such damages were waivable by Carrier and Peirce-Phelps.

172 Any purported disclaimer by Defendants of the implied warranty of merchantability and fitness for a particular purpose was invalid because it failed to disclose the manufacturing/design defect in the roof top unit, and failed to set forth with particularity the qualities and characteristics of the roof top unit which were not being warranted.

173 Conspicuous or not, Plaintiffs would not have seen such waivers in writing until long after the sale and product failure.

174 Defendants failed to timely disclose the effect of the limitation of damage clause in their warranties under Sec. 2-719 of the Uniform Commercial Code.

175 The purported limitation or exclusions to Defendants' liability mean that the purportedly limited remedies provided for in the warranties fails of its essential purpose.

176 All of Plaintiff's damages might reasonably have been avoided but for Defendants' concealment and omissions in violation of the terms of the warranties.

177 Once the defect damaged their residence, Plaintiffs were left no remedy other than litigation to recoup their out of pocket losses and replacement expenses.

178 Plaintiffs did not have the opportunity to re-negotiate the terms of their purchase or the warranties with Carrier and Peirce-Phelps.

179 Upon information and belief, the Defendants have marketed the roof top model domestically as well as internationally, and may have behaved similarly in its dealings with, and proffered similar warranties to, property owners nationwide in response to complaints about material defects in the roof top unit and actionable breaches of warranty.

180 Carrier was negligent in manufacturing the HVAC product and breached

the product's written warranty, and its continuing violations of state and

federal consumer protection statutes include, but are not limited to:

a. Promoting Carrier Model 50GL, Serial # 3805041639 as designed for roof top installation.
b. Promoting Carrier Model 50GL, Serial # 3805041639 as superior to alternative units manufactured by other companies for residential use, and charging higher prices for it, while knowing that in fact it was not superior to such alternatives.
c. Failing to negotiate its disclaimers and/or limitations on (or waiver or exclusions of) liability, which were unconscionable under the facts and circumstances, and inserting them into warranty documents anyway;
d. Failing to negotiate its disclaimers and/or limitations on (or waiver or exclusions of) remedies, which were unconscionable under the facts and circumstances, and inserting them into warranty documents anyway;
e. Placing on the market air conditioners known to be defective, or which were known to likely be defective, while representing these products were free from material defects;
f. Marketing, promoting, and advertising its air conditioner as having residential HVAC uses, characteristics, or benefits that it did not have, and as being of a certain standard, quality, or grade, when really it was of another;
g. Providing a written warranty containing the above referenced disclaimers, limitations, waivers and/or exclusions of liability and/or remedies to the purchaser after the purchaser complained about defects in the Carrier product in an effort to induce the purchaser to forego legal rights and remedies rightfully available to the purchaser, including the right to be reimbursed for the cost of labor necessary to remove the defective Carrier product and install replacement HVAC cooling system and bills to remediate property damage, including mold contamination and water damage;
h. Failing to make conspicuous in its warranty documents the purported disclaimers, limitations, waivers and/or exclusions of liability and/or remedies;
i. Failing to make warranty documents available to the purchaser at or around the time of sale;

j. Failing to honor express verbal warranties made to the purchaser prior to the provision of Carrier's written warranty documents;

k. Failing to process purchaser complaints in a timely fashion, even after being informed that defects in the Carrier product made unsafe the residence into which the HVAC product had been incorporated;

l. [In the prior litigation relating to the identical model and defect] engaging in bad litigation conduct, including demanding as a condition for agreeing to cover the costs of replacement, that purchaser execute settlement release terms with a promise from the purchaser never to purchase another Carrier product, despite that such promises are not required of a consumer in order to avail of such remedies, and without advising the purchaser to seek legal counsel before assenting to provide such releases or promises;

m. Failing to honor Carrier's promise to settle the prior litigation involving the same defect, wherein the settlement agreement was ordered by the Pennsylvania trial court at Carrier's request;

n. Disregarding applicable legal precedents for striking the disclaimers of implied warranties from its warranty documents and otherwise systematically discouraging consumers from availing themselves of their lawful rights in connection with the purchase of defective air conditioners, even as Carrier acknowledged the problem was not unique or limited to the unit purchased by Plaintiffs Hatchigian and Randazzo.

181 Carrier willfully engaged in such practices knowing them to be unfair or deceptive, or unconscionable, with the intent that Plaintiffs would act or fail to act, and be led to forego their legal rights to advance Carrier's commercial interests.

182 The wrongful conduct alleged in this complaint occurred, and continues to occur, in the ordinary course of Carrier's business or occupation and has caused great harm to Randazzo and Hatchigian.

183 Plaintiffs were foreseeable and direct victims thereof.

184 Also, Carrier has also injured the public interest, since its actions continue to pose a threat to the public.

185 As a direct and legal result of Carrier's misleading, deceptive, unfair, false, fraudulent, and unconscionable trade practices, plaintiffs have sustained damages in amounts to be proven at trial.

186 Pennsylvania's Consumer Protection Act provides that an injured party may have damages; injunctive relief; treble damages and the costs of suit, including a reasonable attorney's fee.  73 P.S. § 201-9.2(a). Plaintiffs seek all damages lawfully recoverable related to their purchase of the defective Carrier product  including (but not be limited to) the cost of labor to remove the malfunctioning unit, install replacement HVAC equipment, together with any necessary materials, which cost Carrier has to date refused to pay, with trebling.

187 Plaintiffs seek their actual damages and multiplication of actual damages as allowed by law, or restitution or disgorgement, and punitive damages as available, together with the cost of suit, including reasonable attorneys' fees.

188 Additionally, Plaintiffs seek an injunction against any repetition of the misconduct at issue, including actions by Carrier in violation of the consumer protection statutes of the fifty (50) states, where Carrier may

have behaved similarly (or is likely to behave similarly in the future) as to consumers residing in those states. Such conduct may include, among other acts or omissions constituting unfair trade practices, false promises to consumers and Carrier seller-distributors, intentional fraud, unconscionable disclaimers of liability, misrepresentation, inducement and/or concealment, suppression, or omission of material fact, and/or fraud on the court, and would negatively affected the public interest in those various states.

189 Carrier's conduct and omissions, as alleged in this complaint, constitute unfair or deceptive or unconscionable acts or practices in violation of the consumer protection law of the state of Pennsylvania.

THEREFORE, Plaintiffs request damages in an amount including costs, interest and attorney fees and any equitable relief which the Court deems appropriate.

## COUNT VI
## NEGLIGENT DESIGN
## (Against Manufacturer Carrier)

190 The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

191 Defendant Carrier is the designer, manufacturer, marketer and seller of the roof top unit sold to Plaintiff.

192 Carrier violated tort duties beyond Peirce-Phelps' contractual duties and failed to use due care and skill under the circumstances in ways which may be further disclosed during the course of discovery.

193 The roof top unit could have been designed with drainage components and mechanisms to control carryover moisture, coil icing, variable refrigerant pressure and/or reduced coil load in conformity with the prevailing HVAC industry standards.

194 Carrier's designers failed to modulate unit air flow and were aware that their defective design risked mold damage from water condensation and resulting leakage.

195 The manufacturer's specified air flow volume were exceeded for the existing coil.

196 Alternative feasible designs existed that would not have caused property damage and personal injuries.

197 Carrier knew the roof top unit was defective in design or manufacture.

198 Carrier's design of the roof top unit discharges condensate onto the roof of Plaintiffs' property so that the condensate finds its way into the interior of the residences below via crevices in the roof membrane.

199 The damage resulting to Plaintiffs' property from installation and condensate leaks generated by the roof top unit was foreseeable.

200 At all relevant times, Carrier was on notice of a foreseeable risk of mold which could have been reduced or avoided by the use of a reasonable alternative designs.

201 The failure to utilize such alternative designs caused the product to be unreasonably hazardous, causing mold that contaminated Plaintiffs' home and interfered with their tenant's lease.

202 A national manufacturer of temperature control systems would generally have been aware and foreseen that condensate leaks can occur frequently during the summer months and during periods of extremely high humidity.

203 Carrier's product designers would have been aware that seasonal rainfall can trigger periods of 100% outdoor humidity. Carrier's product designer would have known that the higher the outdoor humidity, the larger the condensate volume the unit will pull from the air and the higher the condensate load on a roof top unit.

204 But Plaintiffs were at no point advised that the excess water entering the roof top unit by way of wind and rain would be driven directly into the unit by the unit's blower, causing wet insulation within the unit and potentially severe property damage below. Carrier did not indicate in

any reasonably manner prior to the sale that its roof top unit is not

operable in the presence of precipitation, such as rainfall or snowfall.

205 Carrier represents that its roof top unit is specifically designed for roof

top installation.

206 Additionally, Carrier did not disclose the fact that the outdoor portion of

the roof top unit was incompatible with standard, residential electrical

wiring systems and failed to provide adequate electrical knockouts for

power and control wiring in an area of the unit protected from rain

exposure.

207 Due to Carrier's negligence, Plaintiffs have incurred extensive property

damage, diminution in the value of their property, lost rents and other

out of pocket expenses.   Its negligent design/manufacture and its failure

to disclose known defects in its product have exposed Plaintiffs and their

tenants to physical harm and health issues including a range of lung

disorders, lung infections, asthma, headaches, other chronic conditions

and the need for hospital visits, entitling Plaintiffs to economic losses.

THEREFORE, Plaintiffs request damages in an amount including costs,

interest and attorney fees and any equitable relief which the Court deems

appropriate.

## COUNT VII
## NEGLIGENT INSTALLATION
## (Against Defendant Peirce-Phelps)

208 The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

209 Defendant was aware that roof top units must operate below their maximum rated airflow and be installed level to prevent moisture carry-over. Defendant was aware that the incorrect pitch of equipment or piping could impede the flow of condensate.

210 Defendant was aware that if the unit was not leveled properly, carry-over moisture could occur at air velocities lower/higher than the threshold set by the manufacturer.

211 Seller Peirce-Phelps negligently failed to make certain that drainage lines had the appropriate pitch and/or negligently failed to make certain that roof top unit was installed completely level.

212 Defendant Peirce-Phelps performed the installation of the roof top unit in a negligent and un-workmanlike manner.

213 Defendant acted negligently in otherwise failing to use due care and skill under the circumstances in ways which may be further disclosed during the course of discovery.

214 Defendant's negligence has resulted in extreme property damage and exposed Plaintiffs and the other occupants of the Brentwood Property to physical harm in the form of serious health conditions including infections of the lung, breathing problems, and other preventable medical conditions, entitling Plaintiffs to economic losses.

THEREFORE, Plaintiffs request damages in an amount including costs, interest and attorney fees and any equitable relief which the Court deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues.

## ATTORNEYS' FEES AND COSTS

Plaintiff is entitled to recover its statutory costs and reasonable and necessary attorneys' fees, as are equitable and just, including those incurred as a result of trial and/or prosecuting or defending an appeal up to the Supreme Court, and all costs of court.

## PRAYER FOR INJUNCTIVE RELIEF AND DAMAGES

WHEREFORE, Plaintiff respectfully requests judgment against Defendants Carrier Corporation and Peirce-Phelps or the following:

a.   An award of actual damages suffered by Plaintiff Hatchigian as a result of Defendants' individual and combined conduct;

b.   A judgment that Defendants have violated their warranty of fitness for a particular purpose;

c.   An injunction restraining the Defendants from continuing to market, sell or distribute the roof top unit; and

d.   An order directing that

    i.   Defendants pay all damages incurred Plaintiff resulting from Defendants' conduct in breach of warranty and compensate Plaintiff for such conduct, together with prejudgment interest thereon;

    ii.   Defendants pay exemplary damages for willful acts done with fraud, malice, and/or gross negligence;

    iii.   Defendants pay Plaintiff's costs, expenses and attorneys' fees, including statutory fees;

e.   Such other and further relief as this Court may deem appropriate.


Respectfully submitted,

**DAVID HATCHIGIAN, PLAINTIFF PRO SE**

**JOAN RANDAZZO, PLAINTIFF PRO SE**

## *VERIFICATION*

I, <ins>Joan Randazzo<br>David Hatchigian</ins>, Plaintiff/Defendant, verify that the facts

set forth in the foregoing are true and correct to the best of my information,

knowledge and belief.

I understand that the statements contained herein are subject to the Penalties

of 18 Pa. C.S.A., §4904 relating to unsworn falsification to authorities.

Joan Randazzo
David Hatchigian
(Print Name)

(Signature)

Date: <ins>August 17, 2020</ins>

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has

been served upon the Attorney of Record of all parties to the above captioned case

in accordance with Pennsylvania Rules of Civil Procedure on this 17 day of August

17, 2020 by the following:

**Via U.S.P.S 3817:**

**MARSHALL, DENNEHEY, WARNER, COLEMAN  GOGGIN**
**KIMBERLY J. WOODIE ESQUIRE**
**COUNSEL FOR CARRIER CORPORATION**
**620 Freedom Business Center**
**Suite 400**
**King of Prussia Pa. 19406**
**610-354-8258**

**SCHWABENLAND & RYAN , P.C.**
**JAMES F. RYAN, ESQUIRE**
**COUNSEL FOR PEIRCE-PHELPS**
**995 Old Eagle Road**
**Suite 306**
**Wayne Pa. 19087**
**610-971-9200**

**DAVID HATCHIGIAN, PLAINTIFF PRO SE**