### FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### COURT OF COMMON PLEAS OF PHILADELPHIA

DAVID HATCHIGIAN
2414 TOWNSHIP LINE ROAD
HAVERTOWN P.A. 19083
610-446-7257

JULY TERM 2015

VS

CARRIER CORPORATION
P.O. BOX 4808, CARRIER PARKWAY
SYRACUSE, N.Y. 13221

NO. 150604314

PEIRCE -PHELPS
JOSEPH P. VAGNOZZI
516 EAST TOWNSHIP LINE ROAD
BLUE BELL, PA. 19422

JURY TRIAL DEMAND

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you. | Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| *You should take this paper to your lawyer at once.  If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.* | *Lleve esta demanda a un abogado inmediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio.  Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.* |
| **Philadelphia Bar Association**<br>**Lawyer Referral**<br>**and Information Service**<br>**One Reading Center**<br>**Philadelphia, Pennsylvania  19107**<br>**(215) 238-6333**<br>**TTY (215) 451-6197** | **Asociacion De Licenciados**<br>**De Filadelfia**<br>**Servicio De Referencia E**<br>**Informacion Legal**<br>**One Reading Center**<br>**Filadelfia, Pennsylvania  19107**<br>**(215) 238-6333**<br>**TTY (215) 451-6197** |

10-284

# IN THE COURT OF PHILADELPHIA COMMON PLEAS-CIVIL

DAVID HATCHIGIAN,                                    JULY TERM 2015

            Plaintiff,                                    NO. 150604314

vs.

CARRIER CORPORATION AND

PEIRCE-PHELPS,

            Defendants.

## COMPLAINT

Plaintiff DAVID HATCHIGIAN, files this complaint against the Defendants, CARRIER CORPORATION and PEIRCE-PHELPS ("Defendants"), seeking damages, attorney's fees and exemplary damages, against the Defendants, for Breach of Contract (Count I); Negligent Design (Count II); Breach of Implied Warranty of Fitness for a Particular Purpose (Count III); Violation of the Magnuson-Moss Warranty Act (Count IV); Breach of Warranty and Violations of Article 2 of the Uniform Commercial Code (Count V), and in support thereof respectfully alleges as follows:

## PARTIES

1

1.   Plaintiff David Hatchigian (hereinafter, "Plaintiff") resides in Havertown Township, Delaware County, Pennsylvania, United States.

2.   Defendant Peirce-Phelps (hereinafter, "Peirce-Phelps) is a Delaware corporation engaged in the distribution of air conditioning and heating systems.  (Plaintiff reserves his right to update the caption with the correct entity information.)

3.   Defendant Carrier (hereinafter, "Carrier") is a Delaware corporation licensed to do business in Pennsylvania and engaged in the designing, engineering, and installation of air-conditioning and temperature-control systems and one of the fifty largest HVAC distributors in the country.  Its parent corporation, UTC Building & Industrial Systems, a unit of United Technologies Corp., is the world's largest high-technology building systems provider and a leading supplier to the aerospace and building systems industries worldwide. (Plaintiff reserves his right to update the caption with the correct entity information.)

## FACT ALLEGATIONS

4.   Plaintiff, a citizen and resident of Pennsylvania, purchased a Carrier rooftop condensing unit air conditioner Model number # 50GL, Serial # 3805G41639 ("roof top unit") from Peirce-Phelps in 2005. Defendant Peirce-Phelps is a wholesale vendor of Carrier air conditioning systems in commercial, industrial, public, and residential buildings and sells Carrier products.  The roof top unit was purchased by exclusively for use at the apartment building @ 7512 Brentwood Road, Philadelphia, PA 19151 ("Property").  Plaintiff was owner-lessor as of the Property, which was leased to tenants at the time the roof top unit was installed.

5.   Defendant Carrier is the designer, manufacturer, marketer and seller of the roof top unit sold to Plaintiff.

2

6.  Plaintiff was not provided with a copy of Carrier's warranties prior to or at the time of the sale of the roof top unit.

7.  Defendant Carrier later provided a warranty document indicating that the roof top unit came with five, ten and fifteen -year warranties from the original installation date.   (See Ex.15-16, Carrier Customer Relations Request response email with attachment, dated March 11, 2015 to Plaintiff.)

8.  The roof top unit was verbally warranted to be in good working condition and waterproof at the time of installation and contained drainage components intended to remove liquid condensate and prevent condensate build-up. (See Ex. 28-53)

9.  Prior to contacting Carrier, Plaintiff regularly replaced the filters at least twice annually and kept the indoor coils and blower wheels clean.

10.  Operational checks on the roof top unit including checks for thermostat cooling set points were performed at least twice annually, in 2008, 2011, 2013.

11. In one such property inspection in 2013, Plaintiff discovered the unit had stopped properly functioning and triggered extensive mold damage throughout the property.

12. As there was no mold anywhere at the property prior to 2013, Plaintiff immediately contacted Defendant Carrier-Peirce Phillips and authorized entry onto his property by their representative, Joseph Vagnozzi. See Ex. 25

13. Joseph Vagnozzi was not the individual who conducted the 2005 sale.

14. He personally visited the site on September 26, 2013. See Ex. 25

3

Case ID: 150604314

15. He visited the site again on February 27, 2015 and later confirmed the condition of the leaking unit.  See Ex. 11

16. After completing an inspection of the entire air conditioner as installed and sealing the sheet metal screws in the unit's housing, Mr. Vagnozzi verbally represented that the unit was properly installed at a level pitch and warranted to Plaintiff that the unit would not cause further roof leaks.  See Ex. 55-57

17. Vagnozzi did not flood the roof surrounding the unit, spray the exposed surfaces or make any adjustments to minimize condensate accumulation during his visits to the site to inspect the unit.

18. Shortly thereafter, the unit commenced leaking again, causing further mold damage to the property.  See Ex.58-90

19. Due to the mold problem, all of Plaintiff's tenants were unable to continue occupying the apartment safely and were compelled to vacate due to mold-related health issues in June of 2015, causing an immediate loss of rents to Plaintiff as Plaintiff could not afford to rectify the air conditioning malfunction.

20. There was no mold prior to installation.  100% of the mold that ultimately had to be removed from 7512 Brentwood Road was attributable to the malfunctioning of Defendants' roof top unit.  Plaintiff sent the bill to the manufacturer in order to recover the replacement cost, in response to which Carrier's agent refused and - notwithstanding the unit had been designed for roof installation – denied guarantying that the unit was waterproof. See Ex. 5

4

21. To date, Joseph Vagnozzio at Peirce Phillips and Elite Water Damage Restoration, Inc. ("EWDR") have each independently verified that water is entering Plaintiff's building through the roof top unit. See Ex. 55-90

22. Additionally, EWDR has confirmed that until the unit is replaced in building it will continue to make mold rendering the dwelling unfit for human habitation.

23. Neither of the two apartments is rentable at the present time, directly due to the property damage and mold contamination that were the consequence of installing Defendants' unit. (See Ex. 55-90.)

24. To date, Plaintiff has paid $2,000 on account of the contract price. See .Ex. 58, 91-95 attached to this complaint. An additional $15,000 is due for materials and labor and $10,000 for loss of profit. See .Ex. 5. The estimated out of pocket cost of labor and materials, other costs expended to rectify the air conditioning unit plus lost profit total over $25,000. See Ex, 61 (Plaintiff's Statement of Claim to insurer). Additionally, Plaintiff can show at trial that labor and materials furnished in the additional amount of $25,000 leaving a balance owing of $25,000 with no credits to date paid by either Defendant. Peirce-Phelps has refused to reimburse any of these expenses to address the property damage and lost rents due to the malfunctioning unit.

25. Defendants cannot lawfully rely on warranty terms purporting to exclude liability for damages such as replacement labor costs.

26. In their dealings with the Plaintiff, Defendants have violated the federal Magnuson-Moss Warranty Act and state consumer protection law, and Plaintiff owner brings this claim in order to vindicate his own rights and those of owners and consumers nationwide.

5

## COUNT I

## BREACH OF CONTRACT

## (Against Defendant Peirce-Phelps)

27. The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

28. In January 2005, the Defendants entered into a contract with Plaintiff to sell a rooftop air conditioning unit (Carrier, MODEL #50GL, SERIAL #H3805641639), including, but not limited to inspecting, servicing, maintaining and cleaning of the unit after the sale. A copy of the essential terms breached by defendants are attached to this Complaint. (See Ex,3,4,5,6,12,13)

29. In exchange for the purchase price of $1,428.00 paid by Plaintiff, Defendants promised delivery of a working roof top unit in good working condition.

30. Subsequently, distributor Peirce Phelps warranted post-sale repair services to address unit leaks.

31. Defendant Peirce Phelps' post-installation warranty service work was not effective to stop the leaks and consequential property damage.

32. The defective roof top unit has caused the ceiling at the Property to collapse from unit leakage, creating mold to form along the roof paneling to contaminate the residential living space below. (See Ex.'58-90).

33. There also an implied warranty that the system would perform all of the basic functions it purported to provide, which was breached once the system did not work properly.

Case ID: 150604314

34. Defendant's violation of the agreement to repair or replace the unit to conform to Defendant's marketing specifications resulted in extensive property damage and exposed Plaintiff's tenants to physical injury in the form of conditions including a range of lung disorders, asthma, and infections of the lung, entitling Plaintiff Hatchigian to economic losses.

35. Additionally, Plaintiff seeks damages for property damage not merely purely economic loss from the defendants' breach of contract.

## COUNT II
## NEGLIGENT DESIGN
## (Against Defendant Carrier)

36. The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

37. The roof top unit was defective in design in that the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design. The failure to utilize such a design caused the product to be unreasonably hazardous, causing mold to form on large surfaces of the property.

38. The damage to Plaintiff's property resulting from condensate leaks generated by Carrier's unit was foreseeable.

39. Carrier's design of the roof top unit caused condensate discharged onto Plaintiff's apartment's ceilings.  Upon sale, neither Carrier nor its distributor Peirce-Phelps represented that the roof top unit would stop functioning in the presence of precipitation, rainfall or snowfall.

7

40. Manufacturers must provide electrical knockouts for power and control wiring in an area of the unit that is protected from rain exposure. The outdoor portion of the roof top unit are not compatible with standard electrical wiring systems in that rainwater escaped into the space below the unit in large quantities to cause significant damage the property.

41. Defendant Carrier did not disclose that an excess of water entering its roof top unit by way of wind driven rain would be driven into the unit by the unit's blower, causing wet insulation within the unit and severe damage to the space below the roof.

42. The roof top unit could have been designed with drainage components and mechanisms to control carryover moisture, coil icing, variable refrigerant pressure and/or reduced coil load in conformity with the prevailing acceptable standards in the air conditioning industry.

43. Carrier's designers would have been aware that rainfall can trigger periods of 100% outdoor humidity and that, the higher the outdoor humidity, the larger the condensate volume the unit will pull from the air and the higher the condensate load on the unit.

44. A national manufacturer of temperature control systems would also have been aware and foreseen that condensate leaks can often occur during periods of extremely high humidity.

45. Carrier's designers failed to modulate unit air flow and were aware that their defective design risked mold damage from water condensation and resulting leakage.

46. The manufacturer's specified air flow volume were exceeded for the existing coil.

47. Alternative feasible designs existed that would not have caused property damage and personal injuries.

48. Defendants acted negligently in otherwise failing to use due care and skill under the circumstances in ways which may be further disclosed during the course of discovery.

49. Defendants' negligence exposed Plaintiff's tenants to physical injury in the form of conditions including a range of lung disorders, lung infection, asthma and related conditions, entitling Plaintiff Hatchigian to economic losses.

50. As a result of Defendants' negligence, Plaintiff has incurred extensive property damage.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### (Against All Defendants)

51. The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

52. Defendants knew, or reasonably should have known that its roof top unit would be principally utilized for air conditioning.

53. Defendant Peirce-Phelps failed to make certain that drainage lines had the appropriate pitch.

54. Defendant Carrier was aware that carry-over moisture could occur at air velocities lower/higher than the threshold set by the manufacturer.

55. Defendant Carrier was aware that roof top units must operate below their maximum rated airflow and that defective equipment could impede the flow of condensate.

9

Case ID: 150604314

56. Defendants acted negligently in otherwise failing to use due care and skill under the circumstances in ways which may be further disclosed during the course of discovery.

57. Defendants' negligence in designing and servicing the unit has resulted in extensive property damage and exposed tenants to physical injury in the form of conditions including infections of the lung, asthma and other preventable medical conditions entitling Plaintiff Hatchigian to economic losses.

58. Defendants knew, or reasonably should have known, Hatchigian would not be the first or only user-purchaser to use the roof top unit as an air conditioner under conditions of rainfall, one of the purposes for which it was sold to consumers.

59. Plaintiff at all times utilized the unit for the primary function it was advertised to perform.

60. Defendants warranted the unit's fitness for the purpose for which it was sold and reasonable workmanship.

61. Defendants impliedly warranted that the roof top unit was fit for the purpose for which it was sold to Plaintiff and was not negligently marketed, negligently constructed or negligently designed.

62. Defendants impliedly warranted their roof top unit would not be defective so as to leak to the extent surrounding roofing material would be caused to collapse, rot and contaminate living spaces of the property.

63. The warranty of fitness of the product for use as an air conditioner was implied in law and existed independent of any representations by the Defendants or Defendants' agents.

10

64. Defendants impliedly warranted proper installation would not cause property damage and cause physical injuries to Plaintiff's tenants.

65. Such warranties arose by operation of law, independent of any contractual representations.

66. Any implied warranties extended to Plaintiff and Plaintiff's tenants.

## COUNT IV
## VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (Against All Defendants)

67. The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

68. The federal Magnuson-Moss Warranty Act ("Magnuson-Moss"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

69. Magnuson-Moss provides a cause of action for breach of warranty. 15 U.S.C. § 2310(d)(1).

70. Defendants breached their warranty to provide goods that are free from defects, and Plaintiff suffered and continues to suffer damages as a result of Defendants' breach.

71. Defendants' written warranties contain terms purportedly limiting Defendants' liability relative to defective products to replacement of the product or refund for the purchase price of the product, at Defendants' option. These terms appear in the same font as the rest of the terms of the warranty, they are not bolded, and they are not printed in a contrasting color. In

short, they are inconspicuous, and that lack of conspicuousness violates Magnuson-Moss. 15

U.S.C. § 2302(a); 15 U.S.C. § 2304(a)(3).  (See Extended Protection Limited Warranty, Ex. 16 )

72. In addition, Defendants' written warranties purport explicitly to exclude liability for

consequential and incidental damages, including for the costs of shipping and labor.  Where

these terms purport to exclude liability for consequential damages, they fail to meet "the Federal

minimum standards for warranty, and, accordingly, they are not enforceable. See 15 U.S.C. §

2304(a)(3).  (See Extended Protection Limited Warranty, Ex. 16 )

73. To the extent Defendants' written warranties purport to disclaim the implied

warranties of merchantability and fitness for a particular purpose, these disclaimers are

ineffective pursuant to 15 U.S.C. § 2308(a) and (c).  (See Extended Protection Limited Warranty,

Ex. 16 )

74. To the extent the above warranty terms effectively purport to exclude liability for

consequential damages, they fail to meet "the Federal minimum standards for warranty, and,

accordingly, they are not enforceable. See 15 U.S.C. § 2304(a)(3).

75. In addition, Plaintiff does not recall receiving a written warranty document before, at,

or around the time that the product was purchased. Plaintiff also does not recall having seen any

copies of the warranty documents displayed at the wholesale warehouse where the produce was

purchased.

76. Upon information and belief, at the time the purported warranties were issued,

Defendants knew that they had not corrected the manufacturing processes that led to litigation

with respect to the defective roof top unit, therefore their disclaimers are unconscionable because

they disclaimed a defect known but not disclosed.

12

77. Defendants' acts and omissions in violation of Magnuson-Moss are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and, accordingly, they are unlawful. 15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

78. Plaintiff has suffered damages and will continue to suffer damages as a result of Defendants' breach of warranty and its failures to comply with its lawful obligations under its written and implied warranties, in particular by way of their refusal to pay for labor costs associated with removal of the defective roof top unit and re-installation of a replacement unit and any supplies and materials needed to remove the defective roof top unit and to reinstall the replacement unit. Plaintiff has also suffered recoverable damages where, in purported reliance on exclusionary language in its written warranty documents, Defendants have refused to pay shipping charges for a replacement product.

79. Magnuson-Moss provides for "other legal and equitable relief where there has been a breach of warranty or failure to abide by the obligations that Magnuson-Moss imposes (15 U.S.C. § 2310(d)(1)) therefore Plaintiff seeks reformation of Defendants' warranty documents to comport with Defendants' obligations under Magnuson-Moss.

80. Plaintiff asks respectfully that the Defendants Carrier Corporation and Peirce-Phelps be enjoined from acting unlawfully to discourage consumers from seeking the full panoply of state and federal remedies available to them.

81. Magnuson-Moss also provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in connection with the commencement and prosecution of lawsuits thereunder, unless the Court in its discretion determines that such an award would be

Case ID: 150604314

inappropriate. 15 U.S.C. § 2310(d)(2).  Plaintiff may request an award pursuant to this provision as a prevailing consumer at the conclusion of this lawsuit.

## COUNT V

## BREACH OF WARRANTY AND VIOLATIONS OF ART. 2 OF THE UNIFORM COMMERCIAL CODE

82. The allegations of the above paragraphs are incorporated herein as if re-alleged in full.

83. The Uniform Commercial Code ("U.C.C."), including Article 2 on Sales, was meant to harmonize the law governing commercial transactions across the United States.  Pennsylvania has adopted the U.C.C., including Article 2.

84. Where adopted, Article 2 governs transactions in goods and warranty rights and obligations.

85. Defendants extend a written warranty directly to consumers and warrant that for a period of years their product shall be free from material defects in workmanship and materials. (See Extended Protection Limited Warranty, Ex. 16)

86. At the time Defendants' purported warranties issued, Defendants knew that they had not corrected the manufacturing processes that led to litigation with respect to the defective roof top unit, therefore their disclaimers are unconscionable because they disclaimed a defect known but not disclosed.

87. In the written warranty belatedly supplied to Plaintiff after Plaintiff advised of the defects in their roof top unit and the property damages caused by the unit, Defendant Carrier

generically, specifically and impliedly purports to exclude liability for consequential and incidental damages. (See Extended Protection Limited Warranty. Ex. 16)

88. These purported exclusions or limitations of liability were at no point negotiated between Carrier, a global corporation with enormous bargaining power, and the plaintiff consumer.

89. Plaintiff never even given the benefit of seeing the purported exclusions and limitations (conspicuous in the warranty or not) until after the mold damage to his income property was triggered and after he sought redress relative to the defective product he purchased.

90. Under these circumstances, the purported exclusions or limitations of liability are unconscionable and invalid.

91. To make matters worse, the defects in the roof top unit sold to Plaintiff were latent and non discoverable by reasonable inspection at the time plaintiffs purchased the goods.

92. As the Defendants must have been well aware, standard roof top units are intended to be installed in areas of structures exposed to the elements.  When these roof top units fail, any product meant to replace the defective unit must be transported to the structure and labor is typically necessary to remove the defective roof top unit, to dispose of it, and to replace it with the replacement unit.

93. Under these circumstances, a purported limitation or exclusion of the partial but necessary remedies of payment or reimbursement for shipping charges and the cost of removal and replacement labor causes the purportedly limited remedy set forth in Carrier's warranty document to fail of its essential purpose. (See Extended Protection Limited Warranty. Ex. 16)

Case ID: 150604314

94. Additionally, any purported disclaimer of the implied warranties of merchantability and fitness for a particular purpose are not valid in that they are inconspicuous and fail to set forth with particularity the qualities and characteristics of the roof top unit which are not being warranted. . (See Extended Protection Limited Warranty Ex. 16)

95. Given these facts and circumstances, plaintiff is now entitled to the full panoply of remedies provided under Article 2 of the U.C.C. as adopted by the state of Pennsylvania, as well as all other applicable remedies.

96. These include replacement of the defective roof top with a non-defective, functioning unit of at least the quality and grade marketed and promised, shipment of the replacement unit to Plaintiff's property, the cost of labor to remove the defective unit, the cost to dispose of the defective unit, and the cost of labor and supplies necessary to install the replacement parts – all at Defendants' expense.

97. Upon information and belief, the Defendants have marketed their roof top unit nationwide and internationally.

98. Upon information and belief, Defendant Carrier may have behaved similarly in its dealings with, and proffered similar warranty documents long after sales have occurred, to consumers across the United States who complain about defective goods and Carrier's breaches of warranty.

99. Pennsylvania's Article 2 and the corresponding U.C.C. provisions not only apply as indicated, but Defendants' breach of the terms of their warranty has caused Plaintiff specific damages, in an amount to be determined at trial.

## ATTORNEYS' FEES AND COSTS

Plaintiff is entitled to recover its statutory costs and reasonable and necessary attorneys' fees, as are equitable and just, including those incurred as a result of trial and/or prosecuting or defending an appeal up to the Supreme Court, and all costs of court.

## PRAYER FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff respectfully requests judgment against Defendants Carrier Corporation and Peirce-Phelps or the following:

1. An award of actual damages suffered by Plaintiff Hatchigian as a result of Defendants' individual and combined conduct;

2. A judgment that Defendants have violated their warranty of fitness for a particular purpose;

3. An injunction restraining the Defendants from continuing to market, sell or distribute the roof top unit;

4. An order directing that

   a) Defendants pay all damages incurred Plaintiff resulting from Defendants' conduct in breach of warranty and compensate Plaintiff for such conduct, together with prejudgment interest thereon;

   b) Defendants pay exemplary damages for willful acts done with fraud, malice, and/or gross negligence;

   c) Defendants pay Plaintiff's costs, expenses and attorneys' fees, including statutory fees;

Case ID: 150604314

d)      Having stated the foregoing allegations and claims, Plaintiff additionally prays that this court issue an Order directing that:

i.    that the subject warranty documents be reformed as necessary, and that certain provisions therein be disregarded as invalid or unenforceable, to permit Plaintiff the full panoply of remedies available for breach of warranty, express and implied, under Article 2 of the Uniform Commercial Code (or the applicable provisions of the Pennsylvania Code, as the court deems appropriate, or otherwise;

ii.    that Plaintiff be immediately afforded all remedies available at law or equity, including but not limited to, awards of damages, restitution, or disgorgement under the consumer protection laws of Pennsylvania, as applicable, in such amounts to be determined at trial, with trebling or other multiplying where permitted by law;

iii.    that Plaintiff be granted an award of punitive damages as available at law or equity, and in an amount to be determined at trial;

iv.    that Defendant Carrier be enjoined from continuing the illegal activities alleged herein;

v.    that Plaintiff recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law

5.   Such other and further relief as this Court may deem appropriate.

**Respectfully submitted,**

Dated: September 20, 2015

*David Hatrington*

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues.

18

Case ID: 150604314

Dated: September 20, 2015

Respectfully submitted,

*David Hutchinson*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon the Attorney of Record of all parties to the above captioned case in accordance with Pennsylvania Rules of Civil Procedure on this 21 day of September , 2015 by the following:

e-file

3817 certificate of mailing

*David Hutchinson*

19

## **CERTIFICATE OF SERVICE**

I, _DAVID HATCHIGIAN_, hereby certify that a true and correct

copy of the foregoing motion/petition and accompanying papers, was served on the

below listed addresses by first-class United States mail, postage pre-paid, on

_SEPTEMBER 21_ (date). _2018_


Name: _CARRIER CORPORATION_
Address: _P.O. BOX 4808 CARRIER PARKWAY_
Address: _SYRACUSE, NY 13221_
City, State, Zip: _____


Name: _PIERCE PHELPS_
Address: _JOSEPH P. VAGNOZZI_
Address: _516 EAST TOWNSHIP LINE ROAD_
City, State, Zip: _BLUE BELL PA A427_


Dated: _September 20, 2018_     By: _David Hatchigian_